UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

YI-ZARN WANG, M.D.                                CIVIL ACTION

v.                                                NO. 17-5134

OCHSNER MEDICAL CENTER –                          SECTION "F"
KENNER, L.L.C., ET AL.


ORDER AND REASONS

Before the Court are two motions: (1) a motion to dismiss by defendants Ochsner Medical Center – Kenner, L.L.C., Ochsner Clinic Foundation, Ochsner Clinic L.L.C., and Ochsner Health System; and (2) a motion to dismiss by Dr. J. Philip Boudreaux. For the reasons that follow, the motions are GRANTED.

**Background**

This civil Racketeer Influenced and Corrupt Organizations Act and state law litigation arises from allegations by Dr. Yi-Zarn Wang that Ochsner Medical Center-Kenner, L.L.C. and its affiliates, and fellow doctor, Dr. J. Phillip Boudreaux, schemed to defraud him by steering neuroendocrine cancer patients from Dr. Wang to Dr. Boudreaux, by trumping up false accusations that Dr. Wang violated hospital policy, and ultimately by suspending Dr.

1

Wang and terminating his privileges at the hospital based on the trumped up accusations and in violation of hospital bylaws.[1]

After initially obtaining a dental degree in his native Republic of China, Dr. Yi-Zarn Wang moved to the United States, where he finished post-graduate school and enrolled in the School of Medicine at The Oregon Health Sciences University. After obtaining his MD degree, Dr. Wang participated in the Barnes Hospital/Washington University Surgical Residency Program in St. Louis, Missouri, a world class surgical oncology discipline under numerous renowned surgeons.

In 1994, Dr. Wang joined the faculty at Louisiana State University Health Sciences Center in New Orleans. Before Hurricane Katrina, he served as Chief of General Surgery and Director of Surgical Education; he also ran surgical cancer care for indigent patients in Louisiana. After Katrina, he relocated and joined the group at Ochsner Medical Center-Kenner, L.L.C. to serve neuroendocrine patients. He partnered with J. Phillip Boudreaux,

---

[1] This factual summary is drawn from the 36-page first amended complaint and the 64-page RICO case statement filed in compliance with this Court's standing order. See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014)(in assessing the plausibility of the allegations in a complaint, courts "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff.").

another surgeon who specialized in neuroendocrine cancer treatment.

For many years, Ochsner promoted Dr. Wang's skills and specialized abilities for patients requiring neuroendocrine cancer surgery. A pioneer in the field, Dr. Wang had developed complicated approaches to surgery and other treatment options for neuroendocrine cancer. For example, Dr. Wang was the first surgeon in the world to intrude lymphatic mapping technique to define surgical resection margin of midgut neuroendocrine tumors to eliminate recurrence and to preserve ilocecal valve in selective patients to reduce post-operative diarrhea. Dr. Wang was the first surgeon to pioneer intra-operative chemotherapy; through this treatment, Dr. Wang targeted midgut neuroendocrine tumor (NET) patients who are often diagnosed at an advanced stage with extensive mesenteric lymph node and liver metastasis. In these cases, even with surgery, small specks of cancerous tissues can still remain. Dr. Wang's treatment targets the potential tumor residuals in mesenteric lymph node dissection beds using a safe and local application of chemotherapy agent 5-fluorouracil (5-FU). The 5-FU is delivered via intraoperative application of 5-FU saturated gel foam strips secured into the mesenteric defect

following the extensive lymphadenectomy.[2] Dr. Wang then mastered the radio-guided surgery for neuroendocrine tumor cytoreductive procedures including a minimally invasive approach to address the lymph nodes metastasis in the neck and upper mediastinum. Dr. Wang also developed techniques to safely dissect and remove tumors encasing major blood vessels to the liver and intestine and became well known for taking on "unresectable" patients from different states and countries.

Dr. Wang became the preeminent NET surgeon at Ochsner Kenner and was the most sought out NET surgeon for academic speaking engagements, professional organizations, and NET patients. This notoriety prompted recruitment efforts by multiple hospitals starting in 2010. It is alleged that Dr. Wang's potential move and loyalty became a concern to Dr. Boudreaux and the hospital. Because they feared losing Dr. Wang, it is alleged, Dr. Boudreaux and Ochsner Kenner sought to minimize Dr. Wang's practice by steering Dr. Wang's patients to Dr. Boudreaux's practice.

To accomplish this, starting as early as 2010, Dr. Boudreaux worked with Ochsner Kenner employee, Pam Ryan, who controlled intake communications with patients,[3] to divert NET patients away

---

[2] Dr. Wang colloquially calls this treatment the "Chinese dumpling," which has dramatically reduced tumor resection bed recurrence and improves long term survival.
[3] Ms. Ryan was required to set up an appointment with Dr. Woltering for new patients, and -- if a surgeon was needed -- then the

4

from Dr. Wang to Dr. Boudreaux. It is alleged that Ms. Ryan would mislead patients from seeing Dr. Wang, direct those patients instead to Dr. Boudreaux, and that she would "penalize" or sabotage those who insisted on seeing Dr. Wang. Nurse Ryan's patient-steering conduct was motivated by "an inappropriate relationship." According to the allegations of the complaint, Dr. Boudreaux increased his own annual earnings through this scheme, earning approximately $100,000 more each year from 2010 to 2016.

Dr. Wang says he discovered the scheme in 2015 and lists about a dozen instances where Ms. Ryan or, on one occasion an unidentified staff member, misled patients by advising the patients that Dr. Wang was unavailable or not accepting new patients, even though Dr. Wang was actually available and accepting new patients. Dr. Wang also alleges that the patient steering scheme was confirmed by two online patient reviews. Through this patient information, Dr. Wang says it became clear to him that a scheme to defraud him of money or property by false representations was calculated to deceive him (through non-disclosure) as well as his patients (through misleading statements and concealing material facts).

---

patient would be referred evenly between the two surgeons. If, on the other hand, a patient or doctor specifically requested Dr. Wang, Ms. Ryan was supposed to follow the referring physician's instruction or patient's request, and set up an appointment with the requested surgeon.

Dr. Wang says he reported to LSU the misleading statements made to his patients and the potential of an inappropriate relationship fueling the patient diversion. LSU told Dr. Wang that he needed to address those issues with Ochsner Kenner and request a new nurse. On October 10, 2015, Dr. Wang met with Ochsner CEO Stephen Robinson to report his concerns. Dr. Wang showed Mr. Robinson emails and communications from his patients regarding Ms. Ryan's patient steering conduct.

In light of this report, it is alleged, Mr. Robinson, Dr. Boudreaux, and others combined to retaliate against Dr. Wang. Dr. Wang alleges that Dr. Boudreaux knew that if Dr. Wang was forced out, Dr. Boudreaux could then be the leading surgeon in Kenner and would inherit Dr. Wang's patients without the need to steer the patients. Ochsner Kenner, it is alleged, was heavily invested in the neuroendocrinology department and worried about Dr. Wang's loyalty to the hospital; the hospital did not want to suffer the financial loss it would experience if it lost Dr. Wang's patients.

The solution, it is alleged, was to ruin Dr. Wang's reputation and keep his patients at Ochsner. Ochsner Kenner and Dr. Boudreaux had to come up with a plan to tarnish Dr. Wang's reputation. Acting on this plan, in early December 2015, Ochsner Kenner and Dr. Boudreaux targeted Dr. Wang's use of Non-Operative Treatment of Appendicitis (NOTA) to trump up a charge that Dr. Wang violated

6

Ochsner Kenner policy. NOTA has received national prominence as accepted treatment for appendicitis; the practice is both scientifically accepted in the medical community and also often practiced at Ochsner Kenner by many physicians.

Dr. Wang preferred NOTA for treating appendicitis. Despite the substantial literature supporting NOTA, on December 18, 2015, the Medical Staff Vice-President at Ochsner Kenner, Najy Masri, wrote to Dr. Wang admonishing him for offering NOTA as an option to his patients. Dr. Masri demanded that Dr. Wang immediately discontinue NOTA for his Ochsner Kenner patients. Dr. Masri also noted that the medical leadership council would refer this matter to the Medical Executive Committee for further review in January.

Dr. Wang responded by detailing the national medical community's acceptance of NOTA; he also requested a meeting to discuss the developments and the trend toward adopting NOTA. On February 4, 2016, the Ochsner Kenner Medical Executive Committee (OK-MEC or the Committee) wrote to Dr. Wang requesting that he provide literature supporting NOTA. Dr. Wang did so; he provided the Committee with evidence of clinical acceptance of the treatment, including five randomized clinical trials, seven meta-analyses, and 60 papers.

In March 2016, the OK-MEC Chair, Dr. Dasa, called Dr. Wang regarding a meeting that occurred on March 17, 2016. Dr. Dasa

informed Dr. Wang that the committee would permit Dr. Wang to use antibiotic therapy for uncomplicated appendicitis on the condition that, if the patient failed to improve within 24 hours, Dr. Wang must cease antibiotic treatment and instead intervene with surgery. To confirm this conversation, the Committee wrote to Dr. Wang on April 26, 2016. Dr. Wang used NOTA for his patients, with their consent, for a 24-hour trial period. If the patient responded appropriately, the therapy continued.

Sometime in April 2016, Dr. Wang was treating a patient with appendicitis; he disclosed to the patient the basic medical information required for informed consent. In front of students and residents, he discussed the treatment options, including the 24 hour rule. Dr. Wang noted this in the patient's chart. The patient responded to the IV antibiotic therapy within the 24-hour benchmark as demonstrated by an improving clinical exam, afebrile and reducing WBC. Dr. Wang offered the patient a surgical option the following morning even with her signs of improvement. She declined surgery, opting to continue antibiotic therapy. IV antibiotics were switched to PO on the second hospital day. The patient was observed in the hospital for an additional 24 hours to make sure she would do well on PO antibiotics. She did. She was discharged to home on PO antibiotics on the third day with instruction that 15% of patients might fail the antibiotic therapy or have recurrence; she was told to return if her condition

worsened or recurred.  This successful treatment followed the medical standard of care and also the Ochsner Kenner policy.

On May 26, 2016, the Committee held a secret emergency meeting regarding Dr. Wang's use of NOTA.  During the meeting, the Committee suspended Dr. Wang for five days.  The grounds for the suspension were the Committee's allegation that Dr. Wang had violated the February 4, 2016 letter requiring that he discontinue NOTA at OMC-K.  The Committee's decision directly contradicted its prior confirmation to Dr. Wang both on the phone and in writing that he could perform NOTA for 24 hours.  Dr. Vinod Dasa drafted a letter on behalf of the Committee; the letter outlined the factually inaccurate and contradictory charges, which it is alleged Ochsner knew were false, unsupported, and misleading and made with the intent to injure Dr. Wang.  Dr. Dasa also called Dr. Wang to inform him of the suspension.[4]

Ochsner Kenner conditioned Dr. Wang's return from the five-day suspension on signing a performance review plan.  To sign the review plan would effectively oblige Dr. Wang to waive appeal rights related to NOTA, admit that his performance needed

---

[4] Dr. Dasa also explained that Dr. Wang violated the conduct policy because insofar as he made derogatory comments about Ochsner Kenner's policy concerning NOTA and "impugns the quality of care" provided by Ochsner Kenner.  The Committee also claimed that Dr. Wang disclosed confidential peer review information outside the peer review process by informing his patient of Dr. Wang's and the hospital's differing views regarding NOTA.

improvement, admit that he acted in a derogatory manner, and admit
to the suspension.  Dr. Wang refused to sign the plan.  When Dr.
Wang returned to Ochsner Kenner after his five-day suspension, he
was told that he no longer had privileges at the hospital because
he failed to sign the plan; a plan Dr. Wang characterizes as
pretextual.

That the peer review process (culminating in Dr. Wang's five-
day suspension and the revocation of his privileges) was a sham is
allegedly demonstrated by Ochsner Kenner's various breaches of the
bylaws.  [1] Ochsner Kenner breached the bylaws by failing to
adhere to the provisions regarding the investigation and
suspension of Dr. Wang's privileges.  The Committee only has
authority to "**recommend** suspension of clinical privileges for a
term" after the OK-MEC or other committee follows the investigative
procedures outlined in the bylaws.  [2] Section 7.3(A)(1) of the
bylaws requires that the OK-MEC provide Dr. Wang notice of the
investigation.  Section 7.3(b)(4) requires that OK-MEC provide Dr.
Wang with an "opportunity to meet with the investigating committee
before it makes its report."  But Ochsner Kenner neither informed
Dr. Wang of the investigation, nor did it allow Dr. Wang an
opportunity to meet with the committee prior to its report.  [3]
Similarly, under Section 7.3(C)(3), after the OK-MEC makes a
recommendation by a report identifying its findings and
conclusions, the bylaws require the committee to refer the

recommendation to the governing board of Ochsner Kenner. But this did not happen with Dr. Wang, who alleges that OK-MEC simply held a secret meeting and decided to suspend Dr. Wang's privileges while breaching the procedural protection of the bylaws. [4] Section 7.4(A)(1) limits summary suspensions to cases where OK-MEC finds that "failure to take such action may result in imminent danger to the health and/or safety of any individual or seriously impair the ability of hospital staff members to perform their duties." But OK-MEC skipped the investigation stage yet made no finding of "imminent danger" in its May 27 letter in which OK-MEC implied that this was a "final finding of responsibility," in violation of the bylaws. [5] By attempting to skirt the hearing process and conditioning Dr. Wang's return on a waiver of rights to a hearing or appeal process, OK-MEC violated the bylaws. The May 27 letter essentially revoked Dr. Wang's privileges and violated the bylaws' requirements regarding notice for hearings.

As a result of his suspension and the revocation of his privileges, Dr. Wang has not maintained privileges at any hospital except Physicians Medical Center in Houma. And, he lost his job at LSU. It is also alleged that Ochsner Kenner and Dr. Boudreaux have continued to misrepresent Dr. Wang's availability to patients in that Dr. Wang's patients are being referred to Dr. Boudreaux, implying that Dr. Wang is no longer practicing medicine, and failing to disclose Dr. Wang's contact information. Dr. Wang was

also required to report the suspension to the Louisiana Board of Medical Examiners. As a result of what transpired at Ochsner Kenner, Dr. Wang's reputation has been damaged.

On May 23, 2017, Dr. Wang sued Ochsner Medical Center-Kenner, L.L.C., Dr. J. Phillip Boudreaux, Ochsner Clinic Foundation, Ochsner Clinic, LLC, and Ochsner Health System in this Court, and on that same day he filed an amended complaint in which he alleges: (A) as to all defendants: violations of the Racketeer Influenced & Corrupt Organizations (RICO) Act, conspiracy to violate the RICO Act,[5] violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA); and (B) as to the Ochsner entities: breach of contract (for Dr. Wang's loss of privileges), negligent misrepresentation (for misrepresentations made during the peer review process), tortious interference with contract (for costing Dr. Wang his job at LSU), tortious interference with prospective relations (for deterring patients from Dr. Wang).[6]

---

[5] Dr. Wang alleges that the defendants committed substantive RICO violations (18 U.S.C. § 1962(c)) and conspired to violate RICO (18 U.S.C. § 1962(d)) when they formed an association-in-fact enterprise that committed criminal wire and mail fraud against him.

[6] Also as to the Ochsner entities, Dr. Wang seeks declaratory and injunctive relief under 28 U.S.C. § 2201; in particular, he seeks a finding that his suspension and loss of privileges is invalid and violated the by-laws agreed to by Ochsner Kenner and Dr. Wang. He requests an order requiring Ochsner Kenner to remove the order of suspension and revocation of Dr. Wang's privileges from its files.

Dr. Wang alleges entitlement to actual damages (including lost wages, lost employee benefits, lost profits, and other direct financial damages); consequential damages (damage to Dr. Wang's economic welfare, mental anguish and physical suffering, harm to Dr. Wang's reputation, lost business reputation, and attorney's fees); statutory trebling and exemplary damages warranted by the defendants' alleged malicious, willful, and egregious conduct. In compliance with this Court's standing order, Dr. Wang filed a RICO Case Statement. Dr. Boudreaux and, separately, the Ochsner entities now seek to dismiss each of Dr. Wang's claims for failure to state a claim upon which relief may be granted.

## I.

### *A.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. <u>See</u> <u>Lowrey v. Tex. A & M Univ. Sys.</u>, 117 F.3d 242, 247 (5th Cir. 1997)(quoting <u>Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.</u>, 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." <u>Ashcroft v.</u>

*Iqbal*, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." *See* *Thompson v. City of Waco, Texas*, 764 F.3d 500, 502 (5th Cir. 2014) (citing *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept as true legal conclusions. *Id.* at 502-03 (citing *Iqbal*, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009)(quoting *Iqbal*, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

14

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). The Court's task "is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." Thompson v. City of Waco, Texas, 764 F.3d 500, 503 (5th Cir. 2014)(citation omitted). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

General notice pleading requirements are based on Rule 8. Rule 9(b) imposes a heightened pleading standard on pleadings alleging fraud:

> (b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). A plaintiff must plead "the particulars of time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." <u>Benchmark Elecs. V. J.M. Huber Corp.</u>, 343 F.3d 719, 724 (5th Cir. 2003)(quoting <u>Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.</u>, 975 F.2d 1134, 1139 (5th Cir. 1992). "[A] plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations." <u>United States ex rel. Rafizadeh v. Continental Common, Inc.</u>, 553 F.3d 869, 873 (5th Cir. 2008). Indeed, the Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." <u>Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.</u>, 565 F.3d 200, 207 (5 Cir. 2009)(citation omitted). Simply put, to comply with Rule 9(b),

plaintiffs must plead the "who, what, when, where, and how" of the alleged fraud.  United States ex rel. Williams v. Bell Helicopter Textron Inc., 417 F.3d 450, 453 (5th Cir. 2005)(internal citation and quotation marks omitted).  If a plaintiff alleges fraud by omission, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading."  Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006).

Rule 9(b)'s particularity requirement applies to RICO claims that rest on predicate acts of mail and wire fraud.  See Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir. 1997); Landry v. Air Line Pilots Ass'n Intern. AFL-CIO, 901 F.2d 404, 430 (5th Cir. 1990).

II.

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961-1968, prohibits certain conduct involving a "pattern of racketeering activity." As an enforcement mechanism, 18 U.S.C. § 1964(c) provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." To pursue a private RICO claim, a plaintiff must show that he has been injured "by reason of" a violation of RICO's criminal prohibitions;

a RICO plaintiff must "establish both but-for cause and proximate cause in order to show injury 'by reason of' a RICO violation." Torres v. S.G.E. Mgmt., L.L.C., 838 F.3d 629, 636 (5th Cir. 2016)(internal citations omitted). "When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006); Allstate Ins. Co. v. Plambeck, 802 F.3d 665, 676 (5th Cir. 2015)(proximate cause is present where the injuries asserted were the "objective of the [RICO] enterprise").

Section 1962 lists four types of RICO violations. Dr. Wang asserts that the defendants violated Section 1962(c), which proscribes participating in the conduct of the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering activity; he also alleges that the defendants conspired to violate this provision in contravention of Section 1962(d). Section 1961(1) defines "racketeering activity" by listing various state and federal crimes, including (as pertinent to this case) the federal crimes of mail and wire fraud. 18 U.S.C. § 1961(1)(B)("any act which is indictable under any of the following provisions of title 18, United States Code...section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)...."). Mail fraud "occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,'

uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 647 (2008)(quoting 18 U.S.C. § 1341). "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element[.]" <u>Id.</u> (quoting <u>Schmuck v. United States</u>, 489 U.S. 705, 712 (1989)). This is so "even if the mailing itself 'contain[s] no false information[.]" <u>Id.</u> (quoting <u>Schmuck</u>, 489 U.S. at 715). These same principles apply to wire fraud, which occurs whenever a person uses the interstate wires to effect a scheme or artifice to defraud. <u>See</u> <u>Pasquantino v. United States</u>, 544 U.S. 349, 353 (2005).[7]

Section 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not

---

[7] The elements of mail or wire fraud are: (1) a scheme to defraud by means of false or fraudulent representation; (2) use of interstate or intrastate mail or wire to execute the scheme; (3) the use of the mail or wire by the defendant to execute the scheme; and (4) actual injury to the plaintiff. <u>In re Burzynski</u>, 989 F.2d 733, 742 (5th Cir. 1993). A plaintiff seeking to prove mail or wire fraud must also prove that the defendant had the intent to defraud. <u>Chris Albritton Constr. Co. v. Pitney Bowes, Inc.</u>, 304 F.3d 527, 532 (5th Cir. 2002). The Fifth Circuit defines this intent element as acting "knowingly and with some specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain" to the defendant. <u>See United States. v. Morganfield</u>, 501 F.3d 453, 464 (5th Cir. 2007)(citation omitted).

a legal entity." An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981). To prove the existence of an association-in-fact enterprise, the plaintiff must submit "evidence of an ongoing organization, formal or informal, and...evidence that the various associates function as a continuing unit." <u>Id.</u> Although an association-in-fact enterprise need not be a business-like entity replete with hierarchy, role differentiation, or chain of command, the Supreme Court has instructed that such an enterprise must feature "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009).

Rather than articulating a meaningful definition of "pattern," Section 1961(5) offers up a minimum necessary condition for the existence of a pattern of racketeering activity: it "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years...after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5); <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 237 (1989). RICO plaintiffs must also satisfy the judiciary's gloss on "pattern": that is, to demonstrate the requisite pattern, a plaintiff must show

"continuity plus relationship," that is, "that the racketeering predicates are related,[8] and that they amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239; Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007)(citation omitted)("'[r]acketeering activity' consists of two or more predicate criminal acts that are (1) related and (2) 'amount to or pose a threat of continued criminal activity.'"). "These requirements keep civil RICO focused on the long term criminal conduct Congress intended it to address, and 'prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law[.]'" Malvino v. Delluniversita, 840 F.3d 223, 231 (5th Cir. 2016)(citations omitted).

In considering what conduct meets RICO's "pattern" requirement, the Supreme Court has observed that RICO's continuity component is "centrally a temporal concept" attributed to Congress's concern with "long-term criminal conduct." H.J. Inc., 492 U.S. at 242. As the Supreme Court has instructed, "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct

---

[8] Related conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., 492 U.S. at 240 (citation omitted).

21

that by its nature projects into the future with a threat of repetition." Id. at 241. Closed-ended continuity exists when the "series of related predicates extend[s] over a substantial period of time," whereas open-ended continuity exists when "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future." Id.

Thus, to plead a RICO claim under Section 1962, a plaintiff must allege "1) a *person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct or control of an *enterprise*." Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007)(emphasis added). If these three elements are sufficiently pled, the Court considers whether the plaintiff adequately states a substantive claim under subsection (c), that is, whether the plaintiff alleges specific facts concerning the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); see also Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989)(noting that "[t]his outline is deceptively simple...since each concept is a term of art which carries its own inherent requirements of particularity.").

*A.*

Against all defendants, Dr. Wang alleges fraud and conspiracy to commit fraud in violation of 18 U.S.C. §§ 1961, 1962, 1964, and 1965, as well as violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, La.R.S. § 51:4101, et seq. As to the Ochsner entity defendants only, Dr. Wang additionally alleges breach of contract (for Dr. Wang's loss of privileges), negligent misrepresentation (for misrepresentations made during the peer review process), tortious interference with contract (for costing Dr. Wang his job at LSU), and tortious interference with prospective relations (for deterring patients from Dr. Wang). Presumably in connection with his breach of contract claim, Dr. Wang seeks injunctive and declaratory relief respecting his suspension and loss of privileges as a result of Ochsner Kenner's alleged violation of the by-laws. All defendants seek dismissal of the plaintiff's RICO claims as well as the plaintiff's state law claims.

*B.*

Given that the Court's jurisdiction is based upon the existence of RICO claims, the Court first takes up whether Dr. Wang has adequately pled his RICO claims predicated on mail and wire fraud.

The defendants advance an assortment of challenges to the plaintiff's RICO allegations. Dr. Boudreaux urges dismissal of the plaintiff's RICO claims against him on the grounds that the allegations fail to satisfy Rule 9(b)'s particularity requirement, the plaintiff has omitted critical facts regarding Dr. Boudreaux's and Dr. Wang's relationship as employees of Louisiana State University School of Medicine, and the plaintiff has failed to allege sufficient facts that Dr. Boudreaux "conducted" the alleged enterprise. The Oschner entities join in Dr. Boudreaux's motion and likewise challenge the sufficiency of Dr. Wang's allegations that each of the defendants conducted the alleged enterprise. The Ochsner entities also move to dismiss on the grounds that Dr. Wang fails to adequately plead the elements of enterprise, pattern, racketeering activity, and causation.

The Court first takes up whether Dr. Wang has satisfied his pleading obligation with respect to the first element of his substantive RICO claim, focusing on the allegations against Dr. Boudreaux and then on the allegations against the Ochsner entities.

1.   Conduct

*(a)   Dr. Boudreaux*

Dr. Boudreaux contends that Dr. Wang's allegations fall short of satisfying Section 1962(c)'s "conduct or participate" requirement because no facts are alleged to indicate that Dr.

Boudreaux affirmatively participated in the alleged enterprise. Dr. Wang has failed to allege facts that would support a finding that Dr. Boudreaux "conducted" the alleged RICO enterprise, the argument goes, given the absence of facts that plausibly suggest that he participated in the patient steering conduct perpetrated by Nurse Ryan.[9] Dr. Wang counters that he has sufficiently pled that Dr. Boudreaux operated and controlled the enterprise. The Court disagrees. The plaintiff's allegations implicating Dr. Boudreaux in wrongful conduct are wholly conclusory and at best amount to an unadorned accusation or speculation that Dr. Boudreaux participated in wrongful conduct. Dr. Wang therefore fails to state a claim against Dr. Boudreaux upon which relief may be granted.

"'[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,'" consistent with Section 1962(c) as the Supreme Court instructs, "one must participate in the operation or management of the enterprise itself." <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993).[10] In so holding, the

---

[9] Ochsner adopts Boudreaux's argument that there are no facts to support the conclusory allegation that Boudreaux "operated and controlled The Enterprise" and "agreed to steer patients away from Dr. Wang."

[10] In <u>Reves</u>, the Supreme Court resolved a conflict among the circuits concerning the meaning of the RICO provision "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." Finding that the word "conduct" embraces some degree of direction, the high court endorsed the "operation or management" test, holding that "'to conduct or participate,

Supreme Court construed the word "conduct" so as to limit RICO liability under Section 1962(c) to those individuals that participate in the operation or management of a RICO enterprise; some degree of direction or control is required to impute substantive RICO liability.  Id.

Given that Dr. Wang fails to advance any allegations that attribute any substantive peer review phase conduct to Dr. Boudreaux,[11] the Court scrutinizes the allegations concerning "the patient steering scheme."  Dr. Boudreaux contends that there is not a single fact alleged that would plausibly support the substantive "conduct" element.  When the Court considers only the facts alleged, and not conclusions or boilerplate, the Court agrees.

Mindful that only well-pled facts must be considered true and that factual content must be pled to permit the reasonable

---

directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself."  Id. at 185 (elaborating and emphasizing that "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs).

[11] The only mention of Dr. Boudreaux with regard to the peer review scheme is: "In his position of leadership within the Enterprise, Dr. Boudreaux explicitly agreed and conspired to attack Dr. Wang's privileges.  However, the actual predicate acts were carried out by Ochsner Kenner, Dr. Dasa, and the OK-MEC."

inference that a defendant is liable, the Court considers Dr. Wang's allegations directed toward Dr. Boudreaux:

- "Dr. Boudreaux...operated and controlled The Enterprise and engaged in a pattern of racketeering through (1) his authorization of the predicate acts through his operation and control of the enterprise and (2) by committing explicit predicate acts."

- "This enterprise is led by Dr. Dasa, Dr. Boudreaux, Mr. Robinson...and Pam Ryan.... While no formal leadership exists, these individuals organize and control the enterprise."

- "Dr. Boudreaux maintained a position of leadership in this Enterprise. Dr. Boudreaux is an active participant in the predicate acts committed by the Enterprise."

- "As a member of leadership of the Enterprise, Dr. Boudreaux along with other members of the Enterprise agreed to steer away patients from Dr. Wang and instead to Dr. Boudreaux. Dr. Boudreaux was a direct participant in the acts committed by the Enterprise...."

- "This scheme was first accomplished in part by the combination of Dr. Boudreaux and Oschner...employee Pam Ryan, who provided false information regarding appointments with Dr.

Wang, and pushed patients to instead receive treatment from Dr. Boudreaux."

- "Ochsner Kenner did not explicitly participate in the initial fraudulent statements by Ms. Ryan."

- "[T]hrough her control of the intake for potential NET patients at Ochsner Kenner, Ms. Ryan would mislead patients from seeing Dr. Wang and instead, direct patients to Dr. Boudreaux. In addition, she would also penalize those who insisted to see Dr. Wang. This association was additionally motivated by an inappropriate relationship."

From this sampling of allegations, no facts are alleged from which the Court could divine what conduct Dr. Boudreaux participated in that advanced the patient steering scheme. The only allegations tethered to factual content suggest that Nurse Pam Ryan misrepresented to potential or current patients Dr. Wang's unavailability so that she could schedule those patients with Dr. Boudreaux instead. Dr. Wang alleges that this conduct on Nurse Ryan's part was "potentially" accomplished in furtherance of an "inappropriate relationship" between Nurse Ryan and Dr. Boudreaux.[12] With no factual content to flesh out the labels Dr.

_____

[12] Insofar as the Court accepts as true the vague allegation that Nurse Ryan and Dr. Boudreaux had an "inappropriate relationship" that "potentially" fueled the patient steering conduct of Nurse Ryan, Dr. Wang is no closer to stating a plausible Section 1962(c) claim against Dr. Boudreaux. To the contrary, liability depends

Wang applies to Dr. Boudreaux, Dr. Wang's allegations fail to suggest that or how Dr. Boudreaux operated or managed the alleged enterprise and therefore fail to comply with federal pleading standards.

Additional allegations concerning Dr. Boudreaux's motive or benefit from the alleged patient steering scheme, equally conclusory and devoid of factual content, fare no better:

- Dr. Wang's loyalty and potential move became a concern to the hospital and to Dr. Boudreaux;

- Dr. Boudreaux's annual earnings were increased substantially as a result (that he earned $100,000 more a year);

- Dr. Boudreaux knew his financial scheme would be eliminated if Dr. Wang went public about the patient steerage. If Dr. Wang was forced out and lost his privileges to practice, Dr. Boudreaux could then be the leading surgeon in Kenner and inherit[] all Dr. Wang's patients without the need for further steering.

Other allegations mention Dr. Boudreaux only insofar as to indicate that Nurse Ryan steered patients toward him and that he benefitted from the minimization of Dr. Wang's practice. Other than

---

upon a showing that the defendants participated in the conduct of the *enterprise's* affairs, not an individual's own affairs. <u>See</u> <u>Reves</u>, 507 U.S. at 185.

boilerplate allegations that Dr. Boudreaux was a leader that was directly involved and authorized and committed predicate acts, the only <u>facts</u> supporting the allegations of patient steering are those attributing access, control, action, and misrepresentations to Nurse Pam Ryan, not Dr. Boudreaux.

Dr. Wang thus fails to identify facts that would allow the Court to infer that Dr. Boudreaux was in fact complicit in the patient steering scheme as part of the alleged RICO enterprise.[13] Notably, Dr. Wang alleges in the RICO Case Statement that Pam Ryan controlled the intake communication with patients, and that she alone scheduled appointments for patients, directing them to either Dr. Wang or Dr. Boudreaux (or, Dr. Woltering if a new patient did not require surgery). It is Pam Ryan whom the plaintiff identifies as the "person making misrepresentation" with

---

[13] In his opposition papers, Dr. Wang insists that his allegations contain factual content. But he simply points to allegations that "Dr. Boudreaux [and] other[s] agreed to steer patients away from Dr. Wang," that Dr. Boudreaux "combined" with Ms. Ryan to misrepresent Dr. Wang's availability, and "the reality that 'Dr. Boudreaux knew that his financial scheme would be eliminated, if Dr. Wang made public the scheme and inappropriate relationship." These allegations concerning conspiracy (conclusory ones, at that) and thoughts or motive patently fail to identify conduct by Dr. Boudreaux that would allow the Court to draw an inference that Dr. Boudreaux participated in a predicate act or scheme. Conclusory allegations divorced from factual content invite speculation only.

respect to each of the patient steering acts outlined on pages 34 through 50 of the RICO Case Statement.[14]

What's missing are factual allegations suggesting affirmative wrongdoing on Dr. Boudreaux's part, as opposed to passive acquiescence. See Rogers v. McDorman, 521 F.3d 381, 389 (5th Cir. 2008)(citing with approval an Eleventh Circuit opinion noting that "federal RICO violations, as a matter of law, require affirmative wrongdoing rather than passive acquiescence[.]"). Stripped of its conclusory allegations, what is it that Dr. Wang alleges that Dr. Boudreaux did? That he benefitted financially from the scheme, and that he "combined" and "agreed" to steer patients away from Dr. Wang. As to the former, financially benefitting from another's conduct or scheme is not sufficient to show that one actually operated the scheme to defraud. Cf. Davis-Lynch, Inc. v. Moreno, 667 F.3d 539, 551 (5th Cir. 2012). Accordingly, insofar as Dr. Wang alleges that Dr. Boudreaux benefitted from Ms. Ryan's alleged patient steering conduct, these allegations nevertheless fail to indicate that Dr. Boudreaux actually operated the scheme to divert the patients.[15] Likewise, that Dr. Boudreaux "agreed" to divert

---

[14] Incidentally, the chart consistently identifies only Pam Ryan as the person making the misrepresentation, save for one occasion when an unidentified "Ochsner Clinic LLC staff member" takes her place. Never Dr. Boudreaux.

[15] The Court need not reach Dr. Boudreaux's argument that it is implausible that Dr. Boudreaux financially benefitted from the scheme because it was LSU that received all monies for both Dr. Boudreaux and Dr. Wang's professional activities.

patients from Dr. Wang fall short of alleging even any conspiratorial role by Dr. Boudreaux; moreover, allegations of acquiescence are too conclusory to be considered true for the purpose of assessing plausibility of a substantive RICO claim against Dr. Boudreaux. Even if the Court construed the allegations of agreement as true, Dr. Wang still falls short of stating a plausible Section 1962(c) claim against Dr. Boudreaux because allegations of mere agreement or acquiescence fail to meet the operation and management test announced by the Supreme Court.

Dr. Wang argues that a defendant need not actually commit a predicate act in order for civil liability under RICO to attach;[16] he insists that a defendant need only operate or control the enterprise. But Dr. Wang may not simply invoke legal tests in the abstract, or magic words, with no concrete facts. He simply fails to identify actual facts in his pleading that, if true, would show that Dr. Boudreaux operated or controlled the enterprise. Recognizing that the generic labels announcing "operation,"

_____

[16] Dr. Wang argues that a defendant may violate RICO even if the defendant has not personally engaged in acts of racketeering. But the Sixth Circuit opinion Dr. Wang invokes to support this proposition -- an opinion that was vacated when the *en banc* court granted rehearing and ultimately affirmed the district court rather than reversing like the panel had done -- merely (unremarkably) observed that a plaintiff need not allege "that each defendant committed two predicate acts as opposed to the enterprise as a whole having committed at least two predicate acts." Jackson v. Segwick Claims Mgmt. Servs., Inc., 699 F.3d 466, 482 (6th Cir. 2012), *vacated on reh'g*, 731 F.3d 556 (6th Cir. 2013)(*en banc*).

"control," and "leadership" are felled by federal pleading standards, as a final attempt to avoid dismissal of his RICO claim against Dr. Boudreaux, Dr. Wang points to his RICO Case Statement, which states on page 36, in "Contents of Misrepresentation #3":

> Pam Ryan and Dr. Boudreaux represented to both W.K. and A.K. that it was the policy of the office to rotate patients so they received consultations from the entire practice, to more efficiently coordinate care. In making this representation, Ms. Ryan steered W.K. and A.K. to Dr. Boudreaux.[17]

This, Dr. Wang argues, suffices to allege that Dr. Boudreaux himself made a misrepresentation to a patient, a predicate act against patients A.K. and W.K "in November 2015." Inconsistently, however, Dr. Boudreaux is conspicuously absent from the row in the chart identifying "person making misrepresentation;" in the patient steering chart, that person is identified as "Pam Ryan." Dr. Boudreaux is never identified as the person making a misrepresentation. Not only is Dr. Boudreaux not identified as the person making the misrepresentation, but he is also missing from the factual explanation underlying the alleged predicate offense, where Dr. Wang identifies the misrepresentation as the predicate offense of wire fraud because "[t]he communications were

---

[17] This allegation is contained in a chart Dr. Wang includes in the Case Statement that directed Dr. Wang to "Provide the date of each predicate act, the participants in each predicate act, and a description of the facts constituting each predicate act."

made via an (sic) interstate telephone communications between Ms. Ryan in Louisiana and to W.K. in the state of Florida."

Insofar as Dr. Wang argues that the stray reference to Dr. Boudreaux sufficiently pleads that Dr. Boudreaux made a misrepresentation to a patient regarding Dr. Wang such that Dr. Boudreaux conducted the enterprise, this argument must be rejected. The federal pleading standards, especially Rule 9(b), which applies to these wire fraud allegations, demand more. Nowhere in the amended complaint or Case Statement does Dr. Wang single out Dr. Boudreaux as making misrepresentations to any patient. Nor does Dr. Wang include any content in his pleadings that would provide a factual predicate to the conclusions he asserts. In short, there is no factual content that would allow the Court to draw the inference that Dr. Boudreaux operated, managed, or somehow participated in the patient steering scheme. No concrete facts to anchor a substantive RICO claim.

*(b) Ochsner Entities*

These pleading shortcomings are equally present when the Court considers the allegations against the Ochsner entity defendants. Citing an absence of factual allegations suggesting operation or management of the alleged enterprise, the Ochsner defendants move to dismiss the plaintiff's claims against Ochsner Health System, Ochsner Clinic Foundation, and Ochsner Clinic LLC.

The plaintiff does not oppose dismissal of Ochsner Clinic Foundation and Ocshner Health System.

Ochsner Health System is not a viable RICO defendant because there are no factual allegations that Ochsner Health System directed the enterprise; the plaintiff merely alleges that Ochsner simply "ratified and approved the acts" of others. Similarly, the plaintiff alleges in conclusory fashion that Ochsner Clinic LLC actually directed the enterprise. As to Ochsner Clinic Foundation, the entity the defendants admit actually employed Nurse Ryan, the plaintiff's RICO claim against this entity likewise fails because RICO liability must be premised on affirmative wrongdoing, not merely employing an individual. The plaintiff's allegations against these three entities do not go beyond conclusions and fail to reach the plausibility threshold. Wholly conclusory assertions devoid of facts allow only speculative inferences not indulged by federal pleading standards. Because the plaintiff has failed to allege facts to support an assertion that any of these defendants directed the enterprise, the Court finds that the plaintiff has failed to plausibly allege a RICO claim as to these defendants.[18] The plaintiff's RICO claims against these entities -- Ochsner

_____

[18] Insofar as the plaintiff "requests leave to amend his complaint to remove Ochsner Clinic Foundation and Ochsner Health Systems regarding his RICO claims," the Court finds that the plaintiff's RICO claims against these entitles must be dismissed, which obviates any proposed amendment.

Health Systems, Ochsner Clinic Foundation, and Ochsner Clinic LLC -- must be dismissed.[19]

## 2. Pattern

The Ochsner entities also move to dismiss Dr. Wang's RICO claims against them on the ground that Dr. Wang fails to allege the continuity and relatedness of predicate acts to plausibly allege a "pattern" of criminal activity. Dr. Wang counters that he has adequately alleged that the predicate acts are related and that the patient steering conduct continues to this day insofar as the defendants continue to advise his patients that he is retired or otherwise unavailable to treat them. Dr. Wang fails to allege the requisite pattern of racketeering sufficient to state a RICO claim against Ochsner Kenner.

To demonstrate the requisite pattern of racketeering, a plaintiff must show "continuity plus relationship," that is, "that

---

[19] Although Dr. Wang alleges that Ochsner Kenner "agreed, authorized, and controlled this [patient steering] fraud through its leadership in the Enterprise," Dr. Wang alleges that "during this period it appears Ochsner Kenner took a passive role and merely authorized and controlled the enterprise's fraud." These conclusory allegations fall short of sufficiently alleging that Ochsner Kenner (or any Ochsner entity) conducted the patient steering scheme that Dr. Wang attributes to Nurse Ryan. Nevertheless, Ochsner Kenner does not move for dismissal of Dr. Wang's substantive RICO claim for failure to sufficiently plead the "conduct" element insofar as Dr. Wang alleges that Ochsner Kenner and its Medical Executive Committee orchestrated the allegedly pretextual peer review scheme.

the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989);[20] Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007)(citation omitted).

RICO's continuity component is "centrally a temporal concept" attributed to Congress's concern with "long-term criminal conduct." H.J. Inc., 492 U.S. at 242. Indeed, "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241. Closed-ended continuity exists when the "series of related predicates extend[s] over a substantial period of time," whereas open-ended continuity exists when "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future." Id.

Dr. Wang insists that he has alleged that the enterprise committed at least 15 known predicate acts over about a five year period, which he says meets the closed period continuity test. He also suggests that his allegations meet the open ended continuity test because he has alleged, in connection with the sham peer

---

[20] Related conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., 492 U.S. at 240 (citation omitted).

review (which culminated in his loss of privileges), that Ochsner continues to represent to patients that Dr. Wang is retired or unavailable to treat them. In so suggesting, Dr. Wang focuses exclusively on the 14 or so misrepresentations to patients forming the so-called patient steering scheme and fails to mention the peer review phase.

Whether Dr. Wang has alleged the requisite relationship between the predicate acts depends on whether the criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240. Dr. Wang's allegations fail to plausibly link the two phases of conduct he suggests comprise the predicate acts committed against him. As for the patient steering phase (multiple instances of alleged wire fraud), Dr. Wang's allegations implicate only Nurse Ryan, whereas the allegations concerning the lone peer review predicate act (wire fraud) are that Dr. Dasa and other doctors, together with Ochsner Kenner, abused the peer review process to force Dr. Wang out. The alleged purpose of steering patients to Dr. Boudreaux was so that the hospital would keep Dr. Wang's patients even if Dr. Wang left Ochsner for another hospital, whereas the allegedly sham peer review process was utilized in order to force out Dr. Wang, Ochsner's star physician. The result of Nurse Ryan's patient

steering conduct was that some patients saw Dr. Boudreaux instead of Dr. Wang, whereas as a result of the sham peer review process, Dr. Wang no longer has hospital privileges at Ochsner. The methods of commission of the patient steering conduct versus the peer review process are different, considering it is alleged that Nurse Ryan misled patients to divert them to Dr. Boudreaux's practice, whereas it is alleged that the peer review process consisted of secret meetings, a sham investigation, trumped-up charges, and violations of hospital bylaws culminating in Dr. Wang's suspension and revocation of his privileges. These two phases or schemes have distinct purposes, results, participants, and disparate methods of commission.

In the amended complaint and RICO Case Statement, the only link between these two phases of conduct is the allegation that the sham peer review process was initiated in retaliation for Dr. Wang's report to management that Nurse Ryan was diverting patients to Dr. Boudreaux in furtherance of an improper relationship between Nurse Ryan and Dr. Boudreaux. However, this allegation does not cure Dr. Wang's failure to allege facts that would support a finding that any of the defendants were complicit in the patient steering phase. In fact, the only patient steering conduct linked to any Ochsner entity is a conclusory allegation disclaiming Ochsner's involvement in patient steering: "Ochsner Kenner did not explicitly participate in the initial fraudulent statements by

Ms. Ryan.... While directly in a leadership role at the Enterprise, during this period it appears Ochsner Kenner took a passive role and merely authorized and controlled the enterprise's fraud." More boilerplate.

No factual predicate is alleged to support Dr. Wang's insinuation of an overarching scheme, nor are facts indicative of common intent adequately pleaded.[21] The isolated nature of the respective phases of alleged fraudulent conduct[22] are laid bare when the Court considers the defendants' argument that the plaintiff fails to plausibly allege the requisite continuity.

Dr. Wang generally alleges that the alleged predicate acts will continue in the future, suggesting that he relies on an open-ended continuity theory. But the defendants contend that he fails

---

[21] Dr. Wang's allegations do not permit a reasonable inference of systemic, as opposed to isolated "illegal" transactions or schemes. There are no facts indicating any leadership or mastermind directing these different schemes conducted by different players at different times using different methods. This is one of the downfalls of conclusory and group-pleading allegations. Where multiple defendants are involved in fraudulent conduct, the plaintiff must connect the allegations of fraud to each defendant. But here Dr. Wang alleges sweeping allegations of mail and wire fraud directed at all of the defendants generally; when he isolates the facts underlying the specific predicate acts, however, he identifies only "fraudulent" conduct perpetrated by non-defendants: Nurse Ryan (as to the patient steering scheme) and Dr. Dasa (as to the peer review scheme).

[22] Notably, there are no well pled allegations implicating Ochsner Kenner in the patient steering conduct.

to allege facts that support a finding of open-ended continuity, which "may be established by a showing that there is a 'specific threat of repetition extending indefinitely into the future,' or 'that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business." <u>Malvino v. Delluniversita</u>, 840 F.3d 223, 232 (5th Cir. 2016).

Here, Dr. Wang alleges that he was targeted because of his preeminence as a physician and as a result of the defendants' fear that he would leave Ochsner and take his patients with him. The defendants contend that these allegations fall short of alleging that the wrongful conduct was a regular way of conducting Ochsner's legitimate business. The Court agrees.

That Dr. Wang's relationship with Ochsner has ended likewise dooms his attempt to allege a pattern based on open-ended continuity, the defendants contend. Again, the Court agrees. Dr. Wang alleges that the goal of the peer review scheme was to push him out ("Dr. Dasa engaged in a scheme to defraud Dr. Wang, by providing him misleading and inaccurate information in order to terminate his privileges" and describing as the ultimate goal "to completely take all of Dr. Wang's patients by eliminating him at Ochsner Kenner"). Significantly, he alleges that the defendants accomplished this goal with the sham peer review proceeding. Where, as here, the enterprise's purported goal has been

accomplished, Dr. Wang has failed to allege a threat of predicate acts continuing into the future. Dr. Wang no longer works for or has privileges at Ochsner such that Ochsner can no longer manage his patients or initiate peer review proceedings concerning his conduct. That Ochsner conducted a sham peer review proceeding culminating in Dr. Wang's termination defeats any attempt by Dr. Wang to show that Ochsner's conduct projects into the future. Dr. Wang has failed to allege a viable pattern of racketeering activity and thus his substantive RICO claim directed at Ochsner Kenner fails to state a plausible claim for relief.[23]

*C.*

The defendants also move to dismiss the plaintiff's claims under Section 1962(d), which prohibits conspiring to violate Section 1962(c). Where a plaintiff fails to state a substantive RICO claim, a RICO conspiracy claim likewise fails. See Nolen v. Nucentrix Broadband Networks Inc., 293 F.3d 926, 930 (5th Cir. 2002)(citation omitted). Moreover, "because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Abraham v. Singh, 480 F.3d 351, 358 (5th 2007)(citation omitted). Because "[s]imply alleging the

---

[23] The Court need not reach the defendants' other asserted grounds for dismissal of the plaintiff's RICO claim.

existence of an agreement...is not sufficient," Dr. Wang's conspiracy claims must be dismissed for failure to state a claim. See Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1140 (5th Cir. 1992)(conspiracy allegations insufficient where the plaintiffs fail to "allege facts implying any agreement involving each of the Defendants to commit at least two predicate acts."). Dr. Wang alleges nothing more than conclusions that the defendants "agreed" or "combined" to violate the RICO statute. These allegations fail to state a claim for civil conspiracy.

IV.

The Court's jurisdiction is based upon the existence of RICO claims, which the Court finds must be dismissed for failure to state a claim.[24] Because the RICO claims supply the only basis for federal jurisdiction, the Court may decline to reach the state law claims. 28 U.S.C. § 1367(c) vests the Court with discretion to decline to exercise supplemental jurisdiction where the Court has dismissed all claims over which it has original jurisdiction. The Court hereby exercises its discretion to decline to exercise supplemental jurisdiction over the plaintiff's state law claims.[25]

---

[24] The plaintiff has had ample opportunities to state a plausible RICO claim. Accordingly, the Court finds that granting the plaintiff an opportunity to amend the amended complaint would be futile.
[25] The Court declines to reach whether Dr. Wang has stated any plausible claim for relief based on state law; the Court finds

***

Accordingly, for the foregoing reasons, IT IS ORDERED: that
Dr. Boudreaux's motion to dismiss is GRANTED and the Ochsner
defendants' motion to dismiss is GRANTED. The plaintiff's RICO
claims are dismissed with prejudice, and his state law claims are
dismissed without prejudice.

New Orleans, Louisiana, December 7th, 2017

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

only that his original complaint, 36-page amended complaint, and
64-page RICO Case Statement fail to state a plausible RICO claim.